## Simmons's Estate.

Argued April 23, 1936.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Howard Zacharias,* with him *James R. Orr,* for appellant.

*John E. McCalmont,* for appellees.

OPINION BY JAMES, J., July 10, 1936:

This is an appeal by the executors of the estate of Jacob Simmons, deceased, both sons of the decedent, on an adjudication of the orphans' court, in which they were surcharged the sum of $1,536.29 with interest from February 20, 1933. The sole question is whether the transaction between the decedent and his son, Daniel, constituted a gift or a loan.

Jacob Simmons, at the time of his death on February 16, 1934, lived with his son, Earl G., on a farm of twenty-seven acres situate in Baldwin Township, Allegheny County, Pa., which was worked by them in partnership. The farm originally consisted of approximately fifty-six acres, but several years prior to his death, dece-

dent had conveyed, to his son, Daniel, about twenty-eight acres of it. In order to build a house on his portion, Daniel obtained a mortgage loan of $5,000. This mortgage fell due in 1931, and was paid off by the proceeds of a mortgage loan of $3,500 from the Fairhaven Building and Loan Association, a loan of $1,200 from his father upon a judgment note and other moneys of his own. The loan from his father was repaid in 1932 from moneys received from Allegheny County for land taken in the construction of a boulevard. Jacob Simmons, prior to 1930, purchased a building and loan account, evidenced by a book, with the Fairhaven Building and Loan Association, which amounted to $1,536.29 on February 20, 1933. On that date, the decedent and his son, Daniel, went to the office of the association. The loan account shows that the full amount was then withdrawn and credited upon the mortgage account of the son, Daniel. The book was then marked "closed," and delivered to the decedent and was found in a drawer of his desk after his death. By his last will, decedent gave $1,000 to his daughter, Martha D. Wakefield, divided the balance of his personal estate among his three daughters, gave his farm, stock and equipment to his son, Earl G., and further stated: "Fifth. My son, Daniel J. Simmons, has received his share of my estate." In relation to this clause, the auditing judge said, "The father deeded to his son one-half of the value of the small farm and it was, and probably is, worth far more than all the personal property which is given to the three daughters." The record contains other testimony which we shall not detail, as it is not determinative of the question involved.

In their account, the executors did not charge themselves with the funds of the building and loan association and the three daughters—sisters of the executors—filed exceptions. After hearing, the auditing judge found the transaction between the decedent and his son, Daniel, was a loan and not a gift, and surcharged

the executors with the withdrawal value of the account. Exceptions to the adjudication were dismissed by the court en banc. In the course of its opinion, the court refused an application for a rehearing stating that the facts averred in the petition could not change the result reached by the auditing judge.

To sustain the transaction as a gift rather than a loan, Daniel J. Simmons testified as follows: "Q. Tell us what your father said to you on that Sunday evening at your house? A. He came in, and it was in the evening, and my wife and I were in the kitchen, and he said, 'Dan, I am going to turn that building and loan book over to you.' I said, 'All right, dad, if that is the way you feel.' He said, 'You see if it can be taken off of your mortgage. I know how hard interest and everything is to pay, and you might as well have the benefit of it.' In the meantime I seen my uncle, who is chairman of the building and loan, and he said, 'Why, sure, it can be done,' so dad says, 'At the next meeting you come and get me and take me down and we will have it done,' and that is what was done." This testimony was corroborated by his wife. On the other hand, the testimony of his brother, Earl G. Simmons, co-executor, was to the effect that he had no knowledge of the transaction until after the death of his father, and took his brother's word as to what the transaction was; and in his testimony, concerning his brother Daniel's conduct immediately after the reading of the will, stated: "A. When we opened the will and he read it—we all read it that was there—and he just didn't seem very well pleased to me; I believe he was hurt more than anything else, to my knowledge of it, and we went out into the hall—my brother-in-law and myself, that is all I remember was there, and he says he didn't know what he was going to do about the book. Q. He said, 'I don't know what I am going to do about the building and loan book'? A. That is what I think he said." Edwin Wakefield, a brother-in-law, testified concerning what occurred im-

mediately after the reading of the will as follows: "Q. Was there anything said by Dan Simmons about it? A. He came out of his father's room, out into the hall, and he made the statement that he thought his father would never make a will like that, and he made a statement about the $3000.00 that he thought that Earl was to pay him. Q. To equalize the farm? A. Yes. And then he made a statement about the building and loan book. He said he didn't know what he was going to do about the building and loan book."

Mrs. Alma Germroth, a sister, testified concerning a conversation with her brother, Daniel: "A. Yes, sir; and we were talking there and discussing it, and wanting him to give us an explanation and he says that he paid it with the county money. Q. He paid for the building and loan with the county money? A. Yes, and we said, then, 'Well, that is not the story your wife told.'...... Q. You told him that wasn't the story his wife told? A. That is what she said at the time. Q. On that day he explained to you, the first explanation was that he had paid his father for the Fairhaven Building & Loan Association book out of the proceeds of the county award, which was $1500.00? A. Yes, sir, that is what was said there." Mrs. Martha Wakefield, a sister, testified concerning a conversation with Daniel: "Q. What was the discussion? A. Well, we told Dan to give us an explanation about the building and loan book, and he said he paid my father back with the county money, and we, of course, said, 'That is not what your wife said,' for she said my father had given it to him, and he said, 'Well'— Q. Did you hear his wife make that statement? A. I did, and he said, 'Well, the building and loan book is turned over in my name, and what are you going to do about it?" Q. Is that the explanation you received? A. Yes. Q. Did you make a further effort? A. The next day he came up again, and we said, 'What about the note? If you paid the building and loan off with the county money, you

couldn't pay the two off.' My sister, Mrs. Kirsch, was there, and he said, 'I paid the note off and I have the cancelled note down at the house, if you want to see it.' And he said again that the building and loan book was turned over in his name and we couldn't do anything about it. That was the next day after the other conversation."

To constitute a valid gift inter vivos, there are two essential elements: (1) An intention or purpose to give, accompanied by (2) a delivery, actual or constructive, of a nature sufficient not only to divest the donor of all dominion over the property, but also to invest the donee with complete control over the subject-matter of the gift: Henderson et al. v. Hughes, 320 Pa. 124, 126, 182 A. 392. Applying this rule to the testimony of Daniel J. Simmons and his wife, it was sufficient, if believed, to establish the transaction between Daniel J. Simmons and the decedent was a gift and not a loan. After the withdrawal, the funds were applied on the mortgage account of the son, Daniel, and were beyond the control of the decedent. His retention of the book gave him no right to the funds, but it was a circumstance to be considered by the auditing judge in connection with the declarations made by Daniel J. Simmons, after his father's death, to determine the truthfulness of his story. These declarations were highly important in throwing light upon the transaction. Daniel's brother and sisters did not learn of the withdrawal until after the death of the father, and the first one to raise any doubt whatever as to the nature of the transaction was Daniel himself. If the transaction was a gift, what reason was there for raising any question concerning the building and loan funds. His anxiety as to what effect the will would have upon the building and loan funds, the contradictions and his refusal to disclose the details of the transaction seriously affected his credibility. The testimony of the sisters and brother-in-law, who would be benefited by the sur-

charge, was corroborated by the brother, Earl G. Simmons, whose conduct indicated implicit faith in his brother and he testified that on the night the will was read, that Daniel was not very well pleased and he then said, "I don't know what I am going to do about the building and loan book?"

The auditing judge in his opinion states: "The credible testimony in this case refutes the claim of a gift of the building and loan stock to Daniel. It is clear from this testimony that he himself did not consider that a gift of the stock in the association had been made to him. His declarations after the death of his father to his brother and sisters and brother-in-law negatived the idea of a gift"; and in conclusion states, "The claim of a gift is an after-thought. There is not sufficient evidence of a gift and the executors must be surcharged with the amount transferred to Daniel......" In the opinion, upon the exceptions to the original surcharge, the court further said: "If the transaction had been intended as a gift, he would have given this book to his son. But even if possession of the book had been given to the son, that would not have proved a gift because of the son's declarations with respect to the fund after his father's death." As to this finding, we cannot say that it is not supported by evidence or reasonable inferences therefrom. A chancellor's findings of fact have the effect of a verdict of a jury when approved by the court en banc and will not be reversed, especially if the decision depends upon the testimony of witnesses whom the trial judge saw and heard: Kahle's Est., 307 Pa. 212, 214, 160 A. 857. Although the testimony was not of such a character as may have been persuasive to us, the finding of the auditing judge that the transaction between the decedent and his son, Daniel, was a loan and not a gift, was supported by evidence or reasonable inferences therefrom.

Decree affirmed at costs of appellant.